EILEEN E. STOREY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Storey v. Commissioner
Docket No. 8636-78.
United States Tax Court
T.C. Memo 1981-88; 1981 Tax Ct. Memo LEXIS 657; 41 T.C.M. (CCH) 975; T.C.M. (RIA) 81088; February 25, 1981. *657 Petitioner worked as a waitress in a coffee shop and in the production showroom in a Las Vegas, Nevada, casino-hotel. Held: (1) Amount of tip income is determined. (2) Respondent's determination of additions to tax under sec. 6653(a) (negligence) is sustained. Eileen E. Storey, pro se. J. L. Millward, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioner for 1974 and 1975 in the amounts of $ 2,994.81 and $ 4,307.15, respectively, and additions to tax under section 6653(a) [1] (negligence) for 1974 and 1975 in the amounts of $ 149.74 and $ 215.36, respectively. After concessions by respondent and abandonment of certain *658 issues, [2] the issues for decision are as follows: *659 (1) Whether petitioner understated her tip income and, if so, by how much; and (2) Whether petitioner is liable for additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in Las Vegas, Nevada. During the first four months of 1974, petitioner worked as a full-time waitress in the Deli at the MGM Grand Hotel (hereinafter sometimes referred to as "the MGM"), a casino-hotel in Las Vegas. During the remainder of 1974 and all of 1975 petitioner worked as a full-time waitress in the Ziegfield Room at the MGM. Petitioner was paid for numbers of hours (excluding vacation and sick leave but including overtime hours actually worked) relative to her work as a waitress as shown in table 1.
Table 1 1974
1975
Deli
627
0
Ziegfield Room
1,380
2,061
1. The Ziegfield Room
The Ziegfield Room first opened on April 23, 1974. During 1974 and 1975, it was the production showroom in the MGM, and its only entertainment feature was the stage show, "Hallelujah Hollywood". *660 There were two shows nightly, except that starting in March 1975 there were three shows hightly on Saturdays. Only drinks were served in the Ziegfield Room (i.e., there were no dinner shows). During 1974 and 1975 there was a four-drink minimum charge of $ 15 (plus 13 1/2 percent taxes) per person. In the Ziegfield Room, waiters and waitresses (hereinafter referred to as "servers") set up the service areas, took drink orders, served drinks, and presented checks; they were assisted by busboys whose function was to supply and help clear the service areas. The Ziegfield Room's service areas were divided into 35 stations. Each server covered a single station by himself or herself. The stations (except station 35) had a varying capacity to serve from 28 to 44 patrons. The Ziegfield Room had a stated capacity of 860 patrons; [3] however, in 1974 and 1975 the Ziegfield Room was operating in excess of stated capacity on a consistent basis. Servers rotated on assignment through the 35 stations on a daily basis; at the end of each rotation a server "floated" for two weeks, during which time he or she was assigned to different stations to substitute for sick or vacationing servers. Rotation *661 and assignments were generally made on an equitable and uniform basis. Servers received hourly wages from the MGM and tips from the Ziegfield Room's patrons. Servers did not pool their tips. Tips were received in cash, and on credit card sales, room charges, and contract (or "coupon") sales. None of these tips were included on a server's Forms W-2 unless the tips were declared to the MGM by the server. Cash tips were received directly from the patron when the patron paid the bill and left a cash tip for the server; charge patrons might also tip in cash. If a credit card patron wrote a tip on the credit slip, the server prepared a "tip payment slip", which was taken to the cashier and redeemed for cash upon receipt or at the end of the shift. If a room charge patron added a tip to the bill, the server also prepared a "tip payment slip". Contract sales were sales from individual or group tour packages. Such packages generally included the cost *662 of room, show, and four drinks for a single price, including taxes and tips. The tips included in the single price were fifteen percent of the price of the show, excluding taxes. On the show, the applicable taxes were a sales tax of 3.5 percent and an entertainment tax of ten percent of the price of the show, excluding tips. Thus, the tips on contract sales amounted to approximately 13.2 percent of the price of the show, including taxes. A customer who purchased the package was given a coupon book containing show and drink coupons; these coupons were used by the customer to pay the bill for the show. The server redeemed the coupons through the cashier and received the fixed tip. Employment in the Ziegfield Room was generally obtained on the basis of seniority, turnover rates were low, and the job offered security. Some minor problems attributable to initial operations occurred in the Ziegfield Room, but petitioner had no continuing problems, and was not below average, with respect to her work as a server. Table 2 reflects information with respect to the Ziegfield Room. Table 2 1974
1975
Paid hours of work by servers
74,852
102,308
Total sales, including taxes
$ 7,946,466.71
$ 13,130,212.61
Adjusted total sales (total
sales less excess of minimum
charge over beverage sales)
$ 6,106,838.00
$ 10,751,051.00
Tips paid out by the MGM on
tip payment slips from credit
card sales, room charges, and
contract sales
$ 245,552.87
$ 398,075.00
Tips declared to the MGM by
servers
$ 157,294.60
$ 261,526.29
*663 For the notice of deficiency, respondent determined petitioner's tip income on the basis of a formula derived from the MGM books and records of the Ziegfield Room and from certain assumptions by respondent. Respondent obtained information as to sales in the Ziegfield Room during 35 days in 1974 and 12 days in 1975 that were charged on Master Charge, American Express, and room charges. Charge sales that reflected no tip charged were excluded from the sample. The days to be used in the charge sales analysis for 1974 were ascertained through the use of a statistical technique known as a stratified random sample; such a technique is commonly used and its application in this case increases the likelihood that variance due to differences in data attributable to daily or seasonal variations were accounted for. The fact that in 1974 only 35 days were sampled (on account of the nonexistence of the Ziegfield Room before April 23, 1974), whereas 52 days were recommended to be sampled for a full year, does not significantly alter or adversely affect the sample. The use of 12 days in the charge sales analysis for 1975 is statistically adequate, since it was designed merely to supplement *664 a base year analysis. Respondent determined petitioner's tip income from the Ziegfield Room as shown in table 3. [4]
Table 3 April 23, 1974
through
December 31, 1974
1975
A. Tip percentage computation
1. Charge sales analyzed
(including taxes)
$ 139,218.50
$ 64,802
2. Tips charged on these sales
$ 21,548.01
$ 8,423
3. Tip percentage (A2./. A1)
15%
13%
B.Tips per hour computation
1. Adjusted total sales
(see table 2)
$ 6,106,838
$ 10,751,051
2. Less 15% stiff and 5%
other (20%)
$ (1,221,368)
$ (2,150,210)
3. Adjusted net sales (B2 - B1)
$ 4,885,470
$ 8,600,841
4. Gross tips (B3 X A3)
$ 732,821
$ 1,118,109
5. Less: 16.67% (tips given to
busboys, bartenders, etc.)
$ (122,161)
$ (186,389)
6. Adjusted tips (B4 - B5)
$ 610,660
$ 931,720
7. Paid hours of work by
servers (see table 2)
74,852
102,308
8.Tip rate per hour (B6./. B7)
$ 8.16
$ 9.11
C. Petitioner's tip income
1. Paid hours of work (see table 1)
1,380
2,061
2. Tip income (B8 X Cl)
$ 11,260.80
$ 18,775.71
*665 On her Federal income tax return for 1974, petitioner reported as compensation from the MGM the $ 8,073.56 shown on her Form W-2 for this year. Of this amount, $ 3,371.91 is tip income declared to her employer and the remaining $ 4,701.65 is other compensation. Of the $ 3,371.91 tip income, $ 3,215.63 is attributable to petitioner's work in the Ziegfield Room. Of the $ 4,701.65 other compensation, $ 3,243.10 is attributable to petitioner's work in the Ziegfield Room. On her Federal income tax return for 1975, petitioner reported as compensation from the MGM a total of $ 12,856. This total is comprised of the $ 9,502 shown on her Form W-2 for this year, and $ 3,354 of additional tip income. Of the $ 9,502 shown on the Form W-2, $ 3,976.50 is tip income declared to her employer and the remaining $ 5,525.50 is other compensation. As a result, of the $ 12,856 petitioner reported for 1975, $ 7,330.50 is tip income. 2. The Deli
The Deli was a coffee shop in the MGM. The Deli was divided into eleven service stations; each station generally contained four tables and had a capacity to serve sixteen to eighteen patrons. Each server covered a single station by himself or herself. *666 Servers rotated on assignment through the stations on a daily basis. Servers did not pool tips. Generally, servers paid about 15 percent of their tips to the busboy assigned to their station; busboys generally covered two or three stations. The amount given to the busboy might vary depending on the quality of assistance rendered. In 1974, servers in the Deli were paid for 80,109 hours of work. In 1974, the Deli made sales of $ 2,124,777 (including sales tax). Respondent determined petitioner's tip income on the basis of a formula derived from the MGM books and records of the Deli and from certain assumptions by respondent. Respondent's analysis was essentially the same as that employed with respect to the Ziegfield Room, supra, except that it involved obtaining information as to sales in the Deli during 52 days in 1974. Respondent determined petitioner's tip income from the Deli as shown in table 4. Table 4 A. Tip percentage computation
1. Charge sales analyzed (including tax)
$ 14,509
2. Tips charged on these sales
$ 2,382
3. Tip percentage (A2./. A1)
16%
B. Tips per hour computation
1. Total sales, including tax
$ 2,124,777
2. Less 15% stiff and 5% other (20%)
$ (424,955)
3. Net sales (B2 - B1)
$ 1,699,822
4. Gross tips (B3 X A3)
$ 271,972
5. Less 16.67% (tips given to busboys, etc.)
$ (45,338)
6. Adjusted tips (B4 - B5)
$ 226,634
7. Paid hours of work by servers
80,109
8. Tip rate per hour (B6./. B7)
$ 2.82
C. Petitioner's tip income
1. Paid hours of work (see table 1)
627
2. Tip income (B8 X C1)
$ 1,768.14
*667 Of the income from the MGM reported by petitioner on her Federal income tax return for 1974, $ 156.28 of the tip income and $ 1,458.55 of the other compensation is attributable to her work in the Deli. The average tip rate per hour for the Ziegfield Room (corresponding to line B8 in table 3) was $ 7.34 for 1974 and $ 8.51 for 1975. The average tip rate per hour for the Deli (corresponding to line B8 in table 4) was $ 2.54 for 1974. OPINION 1. Tip Income
Petitioner reported on her Federal income tax returns, and respondent determined, the amounts of tip income shown in table 5. Table 5 1974
1975
Petitioner reported
$ 3,371.91
$ 7,330.50
Respondent determined
[5] $ 13,028.94
$ 18,775.71
Petitioner maintains that she did not earn the additional tip income determined by respondent. Respondent asserts that petitioner's tip income was not less than the amounts determined by him. Respondent's *668 approach appears to be reasonable; nevertheless, we are persuaded, on the basis of the record herein, that some adjustment to respondent's computation of tip income is necessary. Tips are, of course, includible in gross income under section 61(a), [6] e.g., Olk v. United States,536 F.2d 876, 879 (CA9 1976); Schroeder v. Commissioner,40 T.C. 30, 33 (1963). If a taxpayer fails to keep records or the records kept do not clearly reflect income, then respondent may reconstruct the taxpayer's income by use of a formula. See Mendelson v. Commissioner,305 F.2d 519 (CA7 1962), affg. a Memorandum Opinion of this Court; [7]Meneguzzo v. Commissioner,43 T.C. 824 (1965); Sutherland v. Commissioner,32 T.C. 862 (1959). It is, however, open to petitioner to point out areas or specific instances in which the method used by respondent failed to reflect her true income. Meneguzzo v. Commissioner,43 T.C. at 835. *669 Respondent, on the basis of his statistical analysis, has determined that gross tips in the Ziegfield Room averaged twelve percent of sales, including taxes, for 1974 (15 percent based on the charge slip sample, minus 20 percent of this amount for "stiffs and other adverse factors") and 10.4 percent of sales for 1975 (13 percent minus 20 percent of this amount). If the charge slip sample was adequate, the average server grossed fifteen percent and thirteen percent for 1974 and 1975, respectively, on the charge slip sales where tips were also charged.MGM's method of computing tips on contract sales (15 percent of sales before taxes), results in each server having grossed about 13.2 percent of sales price, including taxes, on these sales. Since the latter categories of sales involved higher average tips than the overall average (after "stiffs", etc.) assumed by respondent, respondent's method of estimating tip income as to the Ziegfield Room necessarily assumes a substantially lower average gross tip rate on cash sales, and on room charges and charge slip sales where no tip was recorded on the charge slip. Respondent determined that gross tips should be further reduced by *670 one-sixth in order to take into account sharing of tips with busboys and bartenders. This determination is consistent with the parties' stipulations in the instant case. We conclude that respondent's method of determining average tip income in the instant case is reasonable. However, respondent's sampling leaves some small margin for error. In addition, we are persuaded that some greater allowance must be made for "stiffs", etc., than respondent was willing to allow. Doing the best we could with the record before us, and taking into account petitioner's lack of adequate records, we have found that the average tip rate per hour for the Ziegfield Room was $ 7.34 for 1974 and $ 8.51 for 1975. Petitioner has failed to show that she received less tip income than the average server in the Ziegfield Room during 1974 and 1975. Indeed, what evidence there is in the record on this point tends to support the conclusion that petitioner received as much tip income as the average Ziegfield Room server. Respondent used the same method in making a determination as to petitioner's tip income from the Deli for early 1974. Taking into account the same factors as apply to the Ziegfield Room, *671 we have found that the average tip rate per hour for the Deli was $ 2.54 for 1974. Petitioner objects to the asserted deficiencies because they allegedly resulted from an improper determination by an Internal Revenue Service official and from a "mass audit".We decline petitioner's invitation to "look behind" the notice of deficiency. This Court proceeds on the basis of the notice of deficiency and a trial de novo (e.g., Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974)), and we see no compelling reason to depart from this practice in the instant case. Petitioner objects to the inclusion of taxes in the formula, arguing that customers do not compute tips on taxes. Although this may be true, removal of taxes from line B1 in tables 3 and 4 would require removal of taxes from line A1 in these tables; the tip percentage (line A3) would thereby increase and the tip rate per hour (line B8) and tip income (line C2) would remain the same. Petitioner objects to respondent's assumptions as to "stiff" rate and tips paid to busboys, etc. The adjustments we have made are all that are justified by the record in the instant case. Petitioner asserts on answering *672 brief that "The amount of tips on charge and credit sales exceeds the amount of cash tips by at least 50%." Firstly, we do not give evidentiary weight to such assertions on brief. See Rule 143(b), Tax Court Rules of Practice and Procedure.[8] Secondly, our conclusions as to overall "stiff" rate, in effect, imply a cash sales tip rate not much more than petitioner argues for. Petitioner objects to the number of days sampled in the charge sales analysis, but offered no evidence to rebut the testimony of respondent's statistician who explained the commonly accepted technique of stratified random sampling and testified as to the degree of reliability that may be expected from such sampling techniques. On this issue we hold that petitioner's tip income is to be determined on the basis of Ziegfield Room tip rates per hour of $ 7.34 for 1974 and $ 8.51 for 1975, and a Deli tip rate per hour of $ 2.54 for 1974. 2. Additions to Tax
Petitioner *673 has the burden of proving error in respondent's determination that additions to tax should be imposed under section 6653(a). [9]Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioner has failed to prove that properly maintained records of tip income would have shown her 1974 and 1975 tip income to be only the relatively small amounts she reported. Petitioner has failed to prove that her lack of proper records was not due to negligence. We conclude that section 6653(a) applies. On this issue we hold *674 for respondent. To reflect the conclusions reached herein, as well as the concessions and abandonments described in note 2, supra, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue. ↩
2. Respondent disallowed $ 390 of petitioner's claimed $ 413 medical deduction for 1975; on brief respondent concedes the medical deduction. Respondent disallowed petitioner's claimed $ 153 sales tax deduction on account of furniture, appliances, fur coat, mirrors, and carpet for 1975; petitioner offered no evidence on this point at trial and makes no mention of the matter on brief--we assume petitioner has conceded this issue. Respondent concedes on brief that petitioner is entitled to a $ 611 real property tax deduction for 1975 instead of the $ 457 she deducted on her return. Respondent disallowed all of petitioner's claimed $ 3,213.44 interest deduction for 1975 ($ 2,927.57 for home mortgage, $ 25.70 for personal loan, $ 215.17 for auto loan, and $ 45 for appliance loan); on brief respondent concedes petitioner is entitled to deduct $ 3,080.86 for home mortgage and $ 215.17 for auto loan. Petitioner offered no evidence at trial on the personal loan and the appliance loan and makes no mention of the matters on brief--we assume petitioner has conceded the interest deductions for the personal loan and the appliance loan. Respondent disallowed petitioner's claimed $ 2,600 child care deduction for 1975; on brief respondent concedes the entire deduction. Respondent disallowed the remaining $ 1,606.56 of petitioner's claimed itemized deductions for 1975 (including the $ 457 real property tax item referred to, supra↩) solely because they aggregated less than the standard deduction; the parties offered no evidence on this point at trial and make no mention of the matter on brief--we assume respondent has conceded this issue since petitioner's concededly deductible itemized deductions for 1975 clearly exceed the standard deduction.
3. So the parties have stipulated. However, the stipulated capacities of 34 service stations indicate a Ziegfield Room capacity of more than 952 to 1,540 patrons. The record contains no explanation of the apparent discrepancy.↩
4. Table 3 describes the method used in the notice of deficiency. As to 1974, table 3 applies this method to only the 1,380 hours petitioner worked in the Ziegfield Room, and not to the 2,007 hours figure used in the notice of deficiency. See table 1, supra.↩
5. In the notice of deficiency, respondent determined petitioner's 1974 tip income was $ 16,377.12. At trial, respondent conceded the reduction to $ 13,028.94, in light of the Deli tip rate being substantially lower than the Ziegfield Room tip rate.↩
6. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; ↩
7. T.C. Memo. 1961-319↩.
8. RULE 143. EVIDENCE (b) Ex Parte Statements: Ex parte affidavits, statements in briefs, and unadmitted allegations in pleadings do not constitute evidence. As to allegations in pleadings not denied, see Rules 36(c), 37(c) and (d).↩
9. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * (relating to income taxes * * *) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendment of this provision by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980 (Pub. L. 96-223, 94 Stat. 253) does not affect the taxable year before us.]↩